## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| JAMES BROWN, Individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>AGWAY ENERGY SERVICES, LLC,<br><br>Defendant. | Civil Action No. _____<br><br>**Class Action Complaint**<br><br>JURY TRIAL DEMANDED |

### CLASS ACTION COMPLAINT

Plaintiff, James Brown ("Brown" or "Plaintiff"), individually and on behalf of all others similarly situated, brings this class action lawsuit against Agway Energy Services, LLC ("Agway" or "Defendant"), and hereby alleges upon personal knowledge as to himself and his own acts, and as to all other matters upon information and belief, based upon, *inter alia,* the investigation made by his attorneys, as follows:

### NATURE OF THE ACTION

1.    This action seeks to redress Defendant's improper pricing practices that have caused thousands of Pennsylvania consumers to pay considerably more for their electricity than they should otherwise have paid.

2.    Traditionally, residential electricity was supplied by regulated utilities like West Penn Power.  The rates utilities could charge were strictly controlled.  In the 1990s, however, Enron's unprecedented lobbying campaign resulted in deregulation of state energy markets in Pennsylvania and elsewhere such that consumers were permitted to choose from a variety of

companies selling residential energy.  Seizing on deregulation, electric generation suppliers ("EGSs") like Defendant Agway have grown rapidly.

3.     Price is the most important consideration for energy consumers.  Given that there is no difference at all in the electricity that Agway supplies as opposed to the consumer's utility, the only reason a consumer switches to an EGS like Agway is for the prices offered in a competitive market as opposed to prices offered by a regulated utility.  That is, after all, the entire point of energy deregulation.

4.     Defendant has taken advantage of the deregulation of the retail electricity market in Pennsylvania by luring consumers into switching energy suppliers with false contractual promises that it offers variable rates for electricity that are based on market-related factors. Defendant lures consumers into switching by offering a teaser rate that is lower than local utilities' rates for electricity supply.  When the teaser rate expires after a couple of months, Defendant charges customers a variable rate, which its customer contract represents is based on market-related factors.  Yet the rate Defendant charges is ***not*** based on market-related factors but is instead an inflated rate based on Defendant's price gouging.

5.     Defendant's conduct injures Pennsylvania consumers and is unconscionable.  In fact, Agway's variable rates are substantially higher than those otherwise available in the energy market.  Agway's business model is simple: after the teaser rate expires, it charges exorbitant rates that are not based on market-related factors.  As a result, Pennsylvania consumers are being fleeced millions of dollars in exorbitant charges for electricity.

6.     This suit is brought pursuant to the common law of Pennsylvania on behalf of a class of consumers who purchased electricity from Agway at any time within the applicable statutes of limitations preceding the filing of this action through and including the date of

judgment.  It seeks, *inter alia*, injunctive relief, actual damages and refunds, attorneys' fees and the costs of this suit.

7.     Only through a class action can Agway's customers remedy Defendant's ongoing wrongdoing.  Because the monetary damages suffered by each customer are small compared to the much higher cost a single customer would incur in trying to challenge Agway's unlawful practices, it makes no financial sense for an individual customer to bring his or her own lawsuit. Further, many customers don't realize they are victims of Agway's deceptive conduct.  With this class action, Plaintiff and the Class seek to level the playing field and make sure that companies like Agway engage in fair and upright business practices.

## PARTIES

8.     Plaintiff James Brown is a natural person and citizen of Pennsylvania.  Plaintiff Brown was a customer of Agway Energy from March 2016 through December 2016, and as a result of Defendant's conduct, he incurred excessive charges for electricity.

9.     Defendant Agway is a limited liability company organized under the laws of Delaware.  Agway's principal place of business and corporate headquarters is in Syracuse, New York.

10.     Agway has amassed a damning public dossier.  For example, the New York Public Service Commission ("NYPSC") in December 2016 banned most EGSs from serving low-income customers in order to "protect low-income customers from [these companies'] unscrupulous business practices . . . ."[1] The NYPSC, however, indicated that it would consider

---

[1] Press Release, NYPSC, ESCOs Banned From Selling to Low-Income Customers in New York (Dec. 15, 2016), *available at* https://www3.dps.ny.gov/pscweb/webfileroom.nsf/Web/565828CCDE596E7B8525808A006F1803/$File/pr16085.pdf?OpenElement (last visited Mar. 8, 2018).

waivers for any company that could guarantee savings or offer other substantial benefit to those customers.[2]   On October 20, 2017, the commission denied Agway's waiver request.[3]   As a result, the NYPSC has continued its ban on Agway from serving low-income customers.

11.     Customers Agway has served have voiced their outrage over Agway's price gouging.  Below is a sampling of Agway customer complaints found on the Internet:[4]

> THIS AGWAY ENERGY SERVICES, LLC IS A TOTAL RIPPOFF I UNABLE
> TO REACH THEM ON THEIR 24 HOUR EMERGY LINE. MY HEAT WENT
> OFF AND I FINALLY CALLED SOMEONE TO FIX IT COST ME $650.00.
>
> Source: https://www.bbb.org/upstate-new-york/business-reviews/natural-gas-
> companies/agway-energy-services-llc-in-syracuse-ny-31925/reviews-and-
> complaints
>
> I fell for the scam to switch to Agway Energy Services (owned by Suburban
> Propane) to be my supplier of choice for natural gas and electricity and ended up
> paying from 15% - 22% more even though they offered me a substantial savings.
> This will be true for most of the calls you receive from these boiler room
> operations. They call 2 - 3 times a week trying to get you to switch to some
> unheard-of company that is "allowed by the state" to save you big bucks on your
> utility bills. You can check with your legitimate utility to see the charges you
> would have paid if you stayed with them versus the charges that these crooks are
> charging you. To add insult to injury, it will take 3 months to get out of the scam
> once you cancel!
>
> Source: https://www.ripoffreport.com/reports/agway-energy-services/-/agway-
> energy-services-scam-alert-scam-alert-scam-alert-i-fell-for-the-scam-to-switch-to-
> a-1222267
>
> So these people at Agway called and promised a lower bill.  My wife and I both
> live paycheck to paycheck and were trying to cut costs any way we could to save
> money.  We decided to try it, and our bill has gone up every month since

---

[2]Michael Kuser, *New York PSC Adopts DER Rules, Sanctions ESCOs*, RTO INSIDER (Oct. 22, 2017), https://www.rtoinsider.com/nypsc-distributed-energy-resources-der-escos-77891/ (last visited Mar. 8, 2018).

[3] 2017 NY PSC Op No. 12-M-0476 (Order Denying Agway Energy Services, LLC's Petition for Waiver of the Prohibition on Service to Low-Income Customers by Energy Service Companies) (Oct. 20, 2017).

[4] Misspellings corrected.

then.  Now it is almost double what we were paying with National Grid.  The bill has definitely gone the wrong way, since they claimed it would go down.  I have contacted them but you are on hold for at least 20 minutes to try and get through.  I have emailed them and left messages with no reply as of yet.  Please do yourself a favor and stay away from them.

Source: https://www.ripoffreport.com/reports/agway-energy-services/nationwide/agway-energy-services-suburban-propane-scam-doubles-your-bill-syracuse-ny-syracuse-ny-1321289

Three customers wrote to Syracuse.com complaining about Agway's overcharging:

Customer 1:  Paid $167 more for electricity and $173 more for gas. (over 1 year)

Customer 2:  Paid $264 more for electricity (over 10 months) and $222 more for gas. (over 9 months)

Customer 3:  Paid $139 more for electricity and $22 more for gas.

Source: http://www.syracuse.com/news/index.ssf/2013/07/winners_and_losers_customers_compare_esco_bills_to_national_grid.html

## JURISDICTION AND VENUE

12.    This Court has subject matter jurisdiction of the claims asserted herein pursuant to 28 U.S.C. § 1332(d)(2)(A) in that the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, the Class has more than 100 members, and diversity of citizenship exists between at least one member of the Class and Defendant.

13.    This Court has general personal jurisdiction over Defendant.  Defendant does business in Pennsylvania through continuous, permanent, and substantial activity in Pennsylvania.

14.    This Court has specific personal jurisdiction over Defendant because it maintains sufficient contacts in this jurisdiction, including the advertising, marketing, distribution and sale of electricity to Pennsylvania consumers.

15.     Venue is proper pursuant to 15 U.S.C. § 80b-14 and 28 U.S.C. § 1391.  Defendant regularly transacts and solicits business in this District, and Plaintiff resides in this District.

16.     Venue is also proper because Defendant's customer contract contains a venue provision fixing venue in Pennsylvania.

## SUBSTANTIVE ALLEGATIONS

### Energy Deregulation and Resulting Wide-Spread Improper Pricing Practices

17.     In 1996, Pennsylvania deregulated the market for retail energy supply, a major break with past policy.  Prior to deregulation, electricity was supplied and distributed solely by local utility companies.  The purpose of deregulation is to enhance competition between energy providers in the hopes that electric generation suppliers ("EGSs") like Defendant would help to lower energy costs.

18.     As part of deregulation, EGSs like Agway are subject to minimal regulation and do not have to seek approval of its rates with the Pennsylvania Utility Commission ("PUC") or the method by which it set its rates.

19.     EGSs play a middleman role: they purchase energy directly or indirectly from companies that produce energy and sell that energy to end-user consumers.  However, EGSs do not deliver energy to consumers.  Rather, the companies that produce energy deliver it to consumers' utilities, which in turn deliver it to the consumer.  EGSs merely buy electricity at the wholesale rate and then sell that energy to end-users with a mark-up.  Thus, EGSs are essentially brokers and traders: they neither make nor deliver electricity, but merely buy electricity from a producer and resell it to consumers.

20.     EGSs such as Agway have various options to buy electricity at wholesale for resale to retail customers, including: owning electricity production facilities; purchasing electricity from wholesale marketers and brokers at the price available at or near the time it is

6

used by the retail consumer; and by purchasing electricity in advance by purchasing futures contracts for the delivery of electricity in the future at a predetermined price. The purpose of deregulation is to allow EGSs to use these and other innovative purchasing strategies to reduce electricity costs.

21.     If a customer switches to an EGS, the customer will have his or her energy "supplied" by the EGS but still "delivered" by their existing utility. The customer's existing utility continues to bill the customer for both the energy supply and delivery costs. The only difference to the customer is which company sets the price for the customer's energy supply.

22.     After a customer switches to an EGS, the customer's energy supply charge—based on a customer's kilowatt hour usage—is calculated using the supply rate charged by the EGS and not the regulated rate charged by customer's former utility. The supply rate charged is itemized on the customer's bill as the number of kilowatt hours ("kWh") multiplied by the rate. For example, if a customer uses 300 kWh at a rate of 11.0¢ per kWh, the customer will be billed $33.00 (300 x $.11) for her energy supply.

23.     Almost all states that deregulated their energy markets did so in the mid to late 1990s. This wave of deregulation was frantically pushed by then-corporate superstar Enron. For example, in December 1996 when energy deregulation was being considered in Connecticut, "the most aggressive proponent" of deregulation, Enron CEO Jeffrey Skilling said:

> Every day we delay [deregulation], we're costing consumers a lot of money . . . .
> It can be done quickly. The key is to get the legislation done fast.[5]

24.     Operating under this sense of urgency, the states that deregulated suffered serious consumer harm. For example, in 2001 forty-two states had started the deregulation process or were considering deregulation. Today, the number of full or partially deregulated states has

---

[5] Christopher Keating, *Eight Years Later . . . "Deregulation Failed"* HARTFORD COURANT, Jan. 21, 2007.

7

dwindled to only seventeen and the District of Columbia. Even within those states several have recognized deregulation's potential harm to everyday consumers and thus only allow large-scale consumers to shop for their energy supplier.

25.      Responding to shocking energy prices, many key players that supported deregulation now regret the role they played. For example, reflecting on Maryland's failed deregulation experience, a Maryland Senator commented: "Deregulation has failed. We are not going to give up on re-regulation till it is done."[6]

26.      A Connecticut leader who participated in that state's foray into energy deregulation was similarly regretful:

> Probably six out of the 187 legislators understood it at the time, because it is so incredibly complex . . . . If somebody says, no, we didn't screw up, then I don't know what world we are living in. We did.[7]

27.      Agway takes advantage of the deregulation and the lack of regulatory oversight in the energy market to deceptively charge Pennsylvania consumers exorbitant rates for electricity. In theory, energy deregulation allows consumers to shop around for the best energy rates, and it allows consumers to take advantage of market-based rates that decline when wholesale costs decline. However, Agway exploits deregulated markets with false promises that its energy rates are based on market-related factors. In fact, Agway's rates are substantially higher than other EGSs or local utilities and they are not reflective of changes in wholesale rates.

28.      One of deregulation's main unintended consequences has been the proliferation of EGSs like Agway whose business model is primarily based on deception. As a result, regulators

---

[6] David Hill, *State Legislators Say Utility Deregulation Has Failed in its Goals*, THE WASHINGTON TIMES, May 4, 2011.

[7] Keating, *supra* note 5.

have also begun to call out the improper pricing practices that pervade deregulated energy markets. For example, in 2014 New York's Public Service Commission ("NYPSC") concluded that New York's residential and small-commercial retail energy markets were plagued with "marketing behavior that creates and too often relies on customer confusion."[8] The NYPSC further noted "it is extremely difficult for mass market retail energy customers to access pricing information relevant to their decision to commence, continue or terminate service . . . ."[9]

29. The improper pricing practices of EGSs like Agway has been devastating to consumers nationwide. For example, based on data recently provided by the major New York electric and gas utilities, the NYPSC calculated that for the 30 months from December 30, 2013 to June 30, 2016 New York's energy service company ("ESCO") customers paid nearly $820 million more for energy than they would have had they stayed with their local utility. New York's low-income consumers have also been hit hard. The utilities reported that low-income ESCO customers paid almost $96 million more than residential utility customers for the same period.

30. Based in large part on the flood of consumer complaints, negative media reports, and data demonstrating massive overcharges the NYPSC announced in December 2016 an evidentiary hearing to consider primarily whether ESCOs should be "completely prohibited from serving their current products" to New York residential consumers.[10] In other words, to reassess whether New York's deregulation experiment has failed everyday consumers.

---

[8] 2014 NY PSC Op No. 12-M-0476 at 4 (Order Taking Actions to Improve the Residential and Small Nonresidential Retail Access Markets) (Feb. 20, 2014).

[9] *Id.* at 11.

[10] 2016 NY PSC Op No. 12-M-0476 at 3 (Notice of Evidentiary and Collaborative Tracks and Deadline for Initial Testimony and Exhibits) (December 2, 2016).

31.     This class action, which in damages, restitution, penalties, and equitable relief is further proof that residential energy deregulation has been an abject failure.

**Agway Charges Improperly High Electricity Rates**

32.     Agway engages in a classic bait and switch deception scheme.  Agway lures consumers into switching to its electricity supply service by offering teaser rates that are much lower than its regular rates.

33.     In or around February or March, 2016, an Agway representative solicited Plaintiff, via a recorded telephone call, to switch from his electric company to Agway.

34.     In March, 2016, Plaintiff made the switch to Agway for electricity.  Thereafter, Plaintiff paid the rate he was charged.

35.     Plaintiff was initially placed on a plan with introductory teaser rates for electricity for the first two months of service.  After those teaser rates expired, Plaintiff was switched to a variable month-to-month rate for electricity.

36.     Agway's customer contract also represents that the variable rate, which is set by Agway, "shall each month reflect the cost of electricity acquired by Agway from all sources (including energy, capacity, settlement, ancillaries), related transmission and distribution charges and ***other market-related factors***, plus all applicable taxes, fees, charges or other assessments and Agway's costs, expenses and margins."  (emphasis added).  A copy of the Agway customer contract is attached hereto as Exhibit "A".

37.     Any reasonable consumer would understand that based on these representations that Agway's variable rate would reflect Agway's costs for purchasing electricity at wholesale, and that the variable rate would be competitive with the rate offered by the local utility and other EGSs.

38.    But the rates Agway charged Plaintiff were not commensurate with rates otherwise available in the market.

39.    Plaintiff paid Agway's variable rate through December 2016.  In January 2017, Plaintiff cancelled his service with Agway and returned to his former local utility, West Penn Power.  The following table is a representative sampling which identifies the billing periods during this time, the variable rates Agway charged Plaintiff, and the corresponding rates West Penn Power would have charged for electricity (which is a reasonable representation of the available market rates):

| Billing Period End Date[11] | Agway Rate | West Penn Power Rate[12] | Difference (%) |
|---|---|---|---|
| 3/17/2016[13] | .059004/kwh | .07000/kwh | -16% (teaser rate) |
| 4/18/2016 | .059002/kwh | .06980/kwh | -15% (teaser rate) |
| 5/17/2016 | .083446/kwh | .06980/kwh | 20% |
| 6/16/2016 | .081841/kwh | .06680/kwh | 23% |
| 7/16/2016 | .085976/kwh | .06410/kwh | 34% |
| 8/17/2016 | .093566/kwh | .06410/kwh | 46% |
| 9/19/2016 | .087523/kwh | .06210/kwh | 41% |
| 10/18/2016 | .08674/kwh | .06060/kwh | 43% |
| 11/16/2016 | .081979/kwh | .06060/kwh | 35% |

---

[11] The first day of the period is approximately thirty days before.

[12] The Price to compare was provided on Plaintiff's electricity bills.

[13] Plaintiff began service with Agway on March 9, so this billing period began on March 9.

| 12/16/2016 | .084617/kwh | .06340/kwh | 33% |

40.     In the electricity market, the rates Pennsylvania utilities like West Penn Power charge is an accurate reflection of rates that are market based.  In fact, West Penn Power purchases electricity for its customers via a competitive procurement process from the same wholesale electricity market as other electricity retailers, including Agway, can purchase electricity for its customers.

41.     For utility customers in Pennsylvania who do not get their electricity supply from an EGS, the utilities buy electricity from the Pennsylvania wholesale electricity markets.  The Federal Energy Regulatory Commission ("FERC") regulates the wholesale electricity market, which is administered by the PJM Interconnection.  Utilities (and EGSs) purchase electricity at the wholesale level for resale to their customers.  Thus, the purchases made by the utilities from the wholesale market reflect actual market costs and conditions.

42.     That Agway's rate was substantially higher than the local utility's rate therefore demonstrates that Agway's rate is not in fact based on the wholesale cost of electricity demonstrated by the fact that Agway's variable rate was consistently significantly higher than West Penn Power's rates.

43.     Notably, Mr. Brown's teaser rates lasted for the first two months of his service. These two months are the ***only*** months when Agway's rate was lower than his utility's contemporaneous rate.

44.     The cost of wholesale electricity is the primary component of the non-overhead costs Agway incurs.  Indeed, Agway concedes and represents as much, listing "the cost of electricity" as the first factor in its definitive list of pricing components.

45.     The other factors Agway identifies in its customer contract (other than cost of electricity, capacity, ancillaries, transmission, and distribution) that affect its variable rate (i.e., "applicable taxes, fees, charges or other assessments and Agway's costs, expenses") are insignificant in terms of the overall costs Agway incurs to provide retail electricity, and do not fluctuate over time.  Therefore, these other cost factors cannot explain Agway's inflated variable rate or the reason its rates are disconnected from changes in wholesale costs.

46.     Agway's identification of "margin" among the factors it considers likewise does not justify its outrageously high rates.  A reasonable consumer might understand that an EGS will attempt to make a reasonable margin on the commodity it sells to consumers.  However, such a consumer would also expect that such profits would be consistent with profit margins obtained by other suppliers of electricity in the market, and also that Agway's profiteering at the expense of its customers would not be so extreme that its rate bears no relation to market prices but is instead outrageously higher.  That other EGSs' rates are lower, even though they purchase electricity from the wholesale market, demonstrates that Agway sets its prices in bad faith. Similarly, West Penn's rate reflects a rate that Agway could charge (because Agway could purchase electricity in the same way and at the same cost as West Penn) plus a reasonable margin.  No reasonable consumer would consider a margin that is often over 100% to be fair or commercially reasonable.

47.     Further, the "EnergyGuard Repair Program, the "Incentive" Agway offers in it is customer contract, cannot account for Agway's inflated rates.  Agway's customer contract states that this program is an incentive and not part of Agway's rate formula.  Agway's competitors offer similar programs or analogous rebate programs but do not charge such exorbitant rates.  In addition, Agway's customers barely use this incentive.  Thus, while Agway bills the

EnergyGuard program as "insurance," because so few customers actually use the program Agway pays out only *de minimus* sums compared to what it reaps as a result of its exorbitant energy charges.

48.    The truth is Agway does not price its energy based on the "market-related" factors enumerated in its contract. The following table is a pre-discovery calculation of the variable rates Agway charged Plaintiff, and the corresponding rates Agway should have charged for electricity based on the factors enumerated in its contract:

| Billing Period End Date[14] | Agway Rate | Contract Rate | Difference (%) |
|---|---|---|---|
| 3/17/2016[15] | .059004/kwh | .06269/kwh | -6% (teaser rate) |
| 4/18/2016 | .059002/kwh | .07094/kwh | -17% (teaser rate) |
| 5/17/2016 | .083446/kwh | .05958/kwh | 40% |
| 6/16/2016 | .081841/kwh | .06353/kwh | 29% |
| 7/16/2016 | .085976/kwh | .07623/kwh | 13% |
| 8/17/2016 | .093566/kwh | .07652/kwh | 22% |
| 9/19/2016 | .087523/kwh | .07192/kwh | 22% |
| 10/18/2016 | .08674/kwh | .07110/kwh | 22% |
| 11/16/2016 | .081979/kwh | .06508/kwh | 26% |
| 12/16/2016 | .084617/kwh | .07625/kwh | 11% |

---

[14] The first day of the period is approximately thirty days before.
[15] Plaintiff began service with Agway on March 9, so this billing period began on March 9.

49.     The Agway contract rate—which corresponds to the factors listed in Agway's customer contract, was estimated based on the costs of a retailer supplying a residential customer for each billing period.  The rate includes PJM Wholesale Charges, such as energy, capacity, settlement and ancillaries and transmission, and other market charges.  A substantial margin to cover retailer fixed costs has also been included.

50.     With discovery of Agway's actual costs, and profits, Plaintiff will be able to create a precise model showing what Agway's prices should have been under the terms of its customer contract.  This model will also demonstrate Agway's exorbitant and unconscionable energy charges.

51.     As set forth above, Agway's breaches its customer contract as its customers do not receive a price based on the specified factors like wholesale costs and competitor pricing. Instead, consumers are charged rates that are substantially higher those of competitors and untethered from the specified market factors.  Agway intentionally fails to disclose this material fact to its customers because no reasonable consumer—including Mr. Brown—who knows the truth about Agway's exorbitant rates would choose Agway as an electricity supplier.

52.     A reasonable consumer would understand that the price the local utility or other EGS charges is part of wholesale market conditions and that a market-based price would be consistent with the price charged by the local utility or other EGS.  However, Agway's prices are substantially and persistently higher than local utilities' rates, as well as the rates other EGSs charge.

53.     Agway knows full well that its rates are unconscionably high.  As such, Agway's actions were actuated by actual malice or accompanied by wanton and willful disregard for consumers' well-being.

54.    Agway's conduct caused injury to Plaintiff because his contract stated that his rate would be based on market-related factors when in fact his rates were not based on such factors.

55.    Had Agway charged Plaintiff a rate that was actually based on market-related factors, Plaintiff would have been charged a substantially lower rate and he was injured accordingly when he paid his bills.

## CLASS ALLEGATIONS

56.    Plaintiff brings this action pursuant to Pennsylvania law on behalf of himself and all other similarly situated Agway customers in the Commonwealth of Pennsylvania who were charged a variable rate for electricity at any time within the applicable statutes of limitations preceding the filing of this action through and including the date of judgment.

57.    Subject to additional information obtained through further investigation and discovery, the foregoing definition of the Class may be expanded or narrowed by amendment or complaint.

58.    Excluded from the Class are Defendant; any parent, subsidiary or affiliate of Defendant; any entity in which any Defendant has or had a controlling interest or which Defendant otherwise control or controlled; and any officer, director, legal representative, predecessor, successor or assignee of a Defendant.

59.    This action is properly maintainable as a class action.  As provided in Pennsylvania law, the proposed Class is so numerous that joinder of all members, whether otherwise required or permitted, is impracticable.  There are questions of law or fact common to all Class Members that predominate over any questions affecting only individual members. Specifically, the common questions of fact and law include:

    i.        Whether Agway breached its contract with Pennsylvania customers by charging variable rates not based on the factors specified in the customer agreements;

    ii.       Whether Plaintiff and the Class have sustained damages and, if so, the proper measure thereof; and

    iii.     Whether Agway should be enjoined from continuing to charge variable rates not based on the factors specified in the customer agreements.

60.    The proposed lead Plaintiff's claims are typical of the proposed class because the proposed lead Plaintiff's claims are based upon the same facts and circumstances (practice or course of conduct) that gives rise to the claims of the other class members and based upon the same predominate legal theories.

61.    The representative Plaintiff can adequately and fairly represent the class.  No conflict of interest exists between the representative Plaintiff and the Class Members because Defendant's alleged conduct affected them similarly.

62.    The Plaintiff and his chosen attorneys are familiar with the subject matter of the lawsuit and have full knowledge of the allegations contained in this complaint so as to be able to assist in its prosecution.  In addition, the Plaintiff's attorneys are competent in the areas of law relevant to this Complaint and have sufficient experience and resources to vigorously represent the Class Members and prosecute this action.

63.    A class action is superior to any other available method for adjudicating this controversy.  The proposed class is (i) the surest way to fairly and expeditiously compensate so large a number of injured persons that constitute the Class, (ii) to keep the courts from being

inundated by hundreds or thousands of repetitive cases, and (iii) to reduce transaction costs so that the injured class members can obtain the most compensation possible. Accordingly, class treatment presents a superior mechanism for fairly resolving similar issues and claims without repetitious wasteful litigation relevant to this action.

## CLAIMS FOR RELIEF

### COUNT I
**(Breach of Contract)**

64.     Plaintiff incorporates by reference the preceding allegations as if fully set forth herein, and further alleges:

65.     Plaintiff and the Class entered into a valid contract with Agway for the provision of electricity.

66.     Pursuant to the Agreement, it is upon information and belief Agway agreed to charge a variable rate for electricity based on market-related factors.

67.     Pursuant to the Agreement, Plaintiff and the Class paid the variable rates charged by Agway for electricity.

68.     However, Agway failed to perform its obligations under its customer contract because Agway charged variable rates for electricity that were not based on market-related factors.

69.     Plaintiff and the Class were damaged as a result because they were billed, and they paid a charge for electricity that was substantially higher than they would have been had Agway based its rates on market-related factors.

70.     By reason of the foregoing, Agway is liable to Plaintiff and the other members of the Class for the damages that they have suffered as a result of Defendant's actions, the amount of such damages to be determined at trial, plus attorneys' fees.

## COUNT II
### (Unjust Enrichment)
### (In the Alternative to Count I)

71.     Plaintiff incorporates by reference the preceding allegations as if fully set forth herein, and further alleges:

72.     By engaging in the conduct described above, Agway has unjustly enriched itself and received a benefit beyond what was contemplated in the contract, at the expense of Plaintiff and the other members of the Class.

73.     It would be unjust and inequitable for Defendant to retain the payments Plaintiff and the Class made for excessive electricity charges.

74.     By reason of the foregoing, Agway is liable to Plaintiff and the other members of the Class for the damages that they have suffered as a result of Defendant's actions, the amount of which shall be determined at trial, plus attorneys' fees.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

    (a) Issue an order certifying the Class defined above, appointing the Plaintiff as Class Representative and designating his attorneys as Class Counsel;

    (b) Enter an order granting monetary relief and damages on behalf of the Class;

    (c) Determine that Agway has been unjustly enriched as a result of its wrongful conduct, and enter an appropriate order awarding restitution and monetary damages to the Class;

    (d) Determine that Agway breached the contract with the Class and enter an appropriate order awarding monetary and injunctive relief;

(e) Enter an order granting all appropriate relief on behalf of the Class under the applicable state laws;

(f) Render an award of compensatory damages, the amount of which is to be determined at trial;

(g) Enter a judgment including interest, costs, reasonable attorneys' fees, costs and expenses; and,

(h) Grant all such other relief as the Court deems appropriate.

## JURY TRIAL DEMAND

Plaintiff hereby demands a jury trial on all issues so triable.

Date: March 13, 2018                     Respectfully submitted,

*/s/ D. Aaron Rihn*
D. Aaron Rihn, Esquire
**ROBERT PEIRCE & ASSOCIATES, P.C.**
Pa. I.D. No.: 85752
707 Grant Street
Suite 2500
Pittsburgh, PA 15219
Phone: 412-281-7229
Facsimile: 412-281-4229
arihn@peircelaw.com

Jonathan Shub*
Kevin Laukaitis*
**KOHN, SWIFT & GRAF, P.C.**
One South Broad Street
Suite 2100
Philadelphia, PA 19107
Phone: 215-238-1700
Facsimile: 215-238-1968
jshub@kohnswift.com
klaukaitis@kohnswift.com

Steven L. Wittels*
J. Burkett McInturff*
**WITTELS LAW, P.C.**

18 Half Mile Road
Armonk, New York 10504
Telephone: (914) 319-9945
Facsimile: (914) 273-2563
slw@wittelslaw.com
jbm@wittelslaw.com
*To Be Admitted Pro Hac Vice*

**Attorneys for Plaintiff and the Class**