## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JAMES BROWN, individually and on behalf of all others similarly situated | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) ) | Civ. A. No. 18-321 Judge Nora Barry Fischer |
| AGWAY ENERGY SERVICES, LLC, | ) ) ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

### I.     INTRODUCTION

Presently before the Court is Defendant Agway Energy Services, LLC's ("Agway") Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) and Brief in Support, (Docket Nos. 21, 22); Plaintiff James Brown's ("Plaintiff") Response, Brief in Opposition, and Exhibits in Support of Opposition to Motion (Docket Nos. 32, 33, 34); and Agway's Reply Brief, (Docket No. 35).  Agway seeks dismissal of all claims asserted by Plaintiff in his March 13, 2018 Class Action Complaint ("Complaint").  (Docket No. 21, at 1).  Count One of Plaintiff's Complaint is a claim for breach of contract. (Docket No. 1, at 18).  Count Two pleads, in the alternative, an unjust enrichment claim.  (*Id.* at 19).  Plaintiff withdrew Count Two, leaving only one claim— breach of contract—pending before the Court.  (Docket No. 33, at 8 n.1).  This Court exercises subject matter jurisdiction over Plaintiff's remaining claim pursuant to 28 U.S.C. § 1332(d)(2)(A) (Class Action Diversity).  After careful consideration of the parties' positions and for the following reasons, Agway's Motion to Dismiss will be granted.

## II.    BACKGROUND

Agway is an electric generation supplier ("EGS") that purchases energy directly or indirectly from energy production companies and, in turn, sells that energy to consumers.[1] (Docket No. 1, at ¶¶ 17, 19). Consumers may opt to switch from a public utility to an EGS, at which point the EGS sets the price for the consumer's energy supply.[2] (*Id.* at ¶ 21). Plaintiff switched to Agway, an EGS, for his electricity needs in March 2016, contractually binding him to electricity rates set by Agway in accordance with Agway's "Customer Contract." (*Id.* at ¶ 34). The Customer Contract, attached to Plaintiff's Complaint as Exhibit A, is a two-page document with key terms provided in an easy-to-read chart on the first page and more comprehensive language enumerated in sections on the second page. (Docket No. 1-1). The first page contains the following relevant language:

> Price Structure: The **Electric** Variable Rate shall be set each month at Agway's discretion and reflect the cost of electricity acquired by Agway from all sources (including energy, capacity, settlement, ancillaries), related transmission and distribution charges, renewable energy compliance charges and other market-related factors, plus all applicable taxes, fees, charges or other assessments and Agway's costs, expenses and margins. The underlying costs are a derivative of the PJM market. The monthly variable price will be communicated to you in your invoice from your Electric Distribution Company (EDC). **There is no limit on how much the variable rate can change from one billing cycle to the next.**
>
> Electricity Supply Price: The first month of the Initial Term will be at an Introductory Rate per kWh for electricity; thereafter a monthly variable rate will apply.
>
> Statement Regarding Savings: Participation in this program is NOT a guarantee of future savings.
> . . . .
> Incentives: EnergyGuard™ Repair Program

---

[1]    EGSs emerged after Pennsylvania deregulated its energy supply market in 1996. *Orange v. Starion Energy PA, Inc.*, 711 F. App'x 681, 682 (3d Cir. 2017).

[2]    Plaintiff's Complaint explains that EGSs like Agway do not actually deliver the electricity to the consumer. Rather, the EGS operates like a broker, buying electricity from various sources and simply reselling it to the consumer. (Docket No. 1, at ¶ 19).

. . . .

Cancellation/Early Termination Fees: Either party may terminate this agreement at any time without prior written notice. There is no early termination/cancellation fee for Variable Rate service.

(Docket No. 1-1, at 2) (emphasis in original).[3] The second page of the Customer Contract contains more detailed terms and conditions that take on a more legal tone:

1. Service. This is an agreement between Agway Energy Services, LLC ("Agway") and the undersigned customer ("Customer") under which Customer will be enrolled as an electric generation supply customer of Agway (the "Agreement"). The Agreement includes the Cover Letter and any approved addenda. Subject to the terms and conditions of this Agreement, Agway agrees to sell and cause to be delivered, and Customer agrees to purchase and accept, Customer's full requirements of electricity for the location(s) listed herein, as estimated by Agway, acquired by Agway from a variety of third party sources. Agway is not affiliated with your Electric Distribution Company ("EDC"). Your EDC will continue to deliver the energy supplied by Agway. Generation price refers to the charge for production of electricity. Transmission price refers to the charge for moving high voltage electricity from a generation facility to the distribution lines of an EDC.

2. Term. This Agreement shall commence as of the first day of the billing cycle which commences immediately after your EDC switches your electric generation supplier to Agway, and shall continue for twenty-four (24) months thereafter (the "Initial Term"). Unless otherwise agreed to, upon completion of the Initial Term, this Agreement will renew with a monthly variable rate methodology with no change to the Agreement without the Customer's affirmative consent. Either party may cancel or terminate this Agreement at any time.

3. Price. The price for electricity sold during the initial term will be at an introductory rate/kwh. All electricity sold under this Agreement will be at a variable price. The variable price will be calculated by Agway, at Agway's discretion, on a customer specific basis each billing cycle and will include all of the costs incurred in providing service to customer, including the following: electricity acquired by Agway from all sources (including energy, capacity, settlement, ancillaries), transmission and distribution charges, renewable energy compliance charges, other market-related charges, plus all applicable

---

[3] Agway argues that the Customer Contract attached to the Complaint (Docket No. 1-1) is not the actual contract that Plaintiff entered into in 2016, and Agway attaches a slightly different customer contract to its Brief in Support of its Motion to Dismiss. (Docket No. 22-1). Despite the two different "versions," Agway concedes that "[t]he relevant terms [in both customer contracts] are similar or identical." (Docket No. 22, at 13 n.14). Because the Court "must accept the allegations in the complaint as true," the Court will use the exact language of the Customer Contract provided by the Plaintiff at Docket No. 1-1. *Morrow v. Balaski*, 719 F.3d 160, 165 (3d Cir. 2013).

taxes including the gross receipts tax, fees, charges or other assessments and Agway's costs, expenses and margins. The underlying costs are a derivative of the PJM market (PJM Interconnection, LLC is a regional transmission organization that coordinates the movement of wholesale electricity in all or parts of 13 states, including Pennsylvania). This price will be calculated for each meter each month, depending upon factors such as changes in wholesale energy prices, or other variables listed above, and so the price for each meter, even for the same customer, are likely to be different each month. All charges will be included in our monthly, per kwh charge. There is no limit on how much the variable rate can change from one billing cycle to the next. Historical prices are not indicative of present or future prices. To obtain historical average billed prices, please contact us at 1-888-982-4929 or www.agwayenergy.com.

    a. Generation prices are set by the electric generation supplier you have chosen, in this case, Agway. The Pennsylvania Public Utility Commission regulates distribution prices and services. The Federal Energy Regulatory Commission regulates transmission prices and services.

4. Agency (electric): Customer hereby designates Agway as agent to: (a) arrange and administer contracts and service agreements between Customer and Agway and those entities, including PJM, engaged in the generation, transmission and delivery of Customer electricity supplies; and (b) nominate and schedule with the appropriate entities including your EDC for the delivery of electricity to the EDC which is the interface between PJM and the and the Customer's end-use premises. Agway as agent for the Customer will schedule the delivery of adequate supplies of electricity that meet the Customer's requirements as established by your EDC and in response to information provided by your EDC. These services are provided on an arm's length basis and market-based compensation is included in the price noted above.

. . . .

9. Incentives. Customer is eligible for, and will receive service under the Agway EnergyGuard™ program when Customer begins receiving their electricity supply from Agway and according to the EnergyGuard terms and conditions, which are separate from this Agreement. Customer should refer to the EnergyGuard brochure for the terms and conditions and details on this incentive. Agway will notify the Customer if the terms and conditions of the EnergyGuard program are updated or otherwise changed at least thirty (30) days in advance of any such change. Customer may terminate this Agreement without penalty if the proposed changes to the EnergyGuard program are unacceptable. If Customer terminates this commodity Agreement with Agway, Customer will no longer receive the benefits of the Agway EnergyGuard program. It may take thirty (30) to sixty (60) days to enroll Customer in the EnergyGuard™ program after Customer switches to Agway.

10. Dispute Resolution. In the event of a disagreement involving Agway's service hereunder, the parties will use their best efforts to resolve the dispute. If Customer is not satisfied following discussion with Agway, Customer may

contact the Pennsylvania Public Utility Commission. A dispute or complaint relating to a residential customer may be submitted by Customer at any time to the Pennsylvania Public Utility Commission's Bureau of Consumer Services by calling 1-800-692-7380.

. . . .

13. Choice of Laws. Venue for any lawsuit brought to enforce any term or condition of this Agreement or to construe the terms hereof shall lie exclusively in the State of Pennsylvania. This Agreement shall be construed under and shall be governed by the laws of the State of Pennsylvania without regard to application of its conflicts of laws principles.

14. No Warranties. Unless otherwise expressly set forth in this Agreement, Agway provides, and Customer receives, no warranties, express or implied, statutory, or otherwise and Agway specifically disclaims all other warranties, express or implied, including, without limitation, warranties of merchantability or fitness for a particular purpose.

. . . .

19. For inquiries and information regarding Electric Generation Suppliers and the Competitive Retail Energy Market, contact the Pennsylvania Public Utility Commission's toll-free number at 1-800-692-7380 or visit their web site at www.PaPowerSwitch.com.

. . . .

21. Entire Agreement. This Agreement is binding upon the parties hereto and their respective successors and legal assigns. This Agreement contains the entire agreement between the parties and supersedes all prior negotiations, proposals, understandings, representations and oral or written agreements with respect to the subject matter hereof. Subject to Agway's rights, as set forth in this Agreement, to unilaterally change prices for each Renewal Term and to unilaterally modify this Agreement to reflect a Regulatory Change, this Agreement may only be amended by a writing executed by both parties, and provisions herein may only be waived by Agway in writing.

(Docket No. 1-1, at 3).

Plaintiff alleges that he "was initially placed on a plan with introductory teaser rates for electricity for the first two months of service."[4] (Docket No. 10, at ¶ 35). After those two months, Agway charged a variable month-to-month rate that was between 20% and 46% higher than his

---

[4] Plaintiff alleges in his Complaint that he received *two* months at the introductory rate even though the Customer Contract states that the introductory rate only applies to the first month. (Docket No. 1, at ¶ 35). This inconsistency does not appear to materially affect the issues in the Motion to Dismiss as Plaintiff is challenging the billed rates based on the variable rate, not the introductory or "teaser" rate.

local utility's rates during those same months. (*Id.* at ¶¶ 35, 39). Plaintiff cancelled his service with Agway in January 2017, and he returned to his local utility. (*Id.* at ¶ 39).

Plaintiff brings this suit individually and on behalf of all others similarly situated alleging that Agway uses improper pricing practices with respect to its variable rates, resulting in its consumers paying considerably more for their electricity than they otherwise should pay under the Customer Contract. (*Id.* at ¶ 1). According to Plaintiff, Agway lures customers into switching energy suppliers by offering initial teaser rates and then promising a variable rate based on market-related factors. (*Id.* at ¶ 4). In reality, Plaintiff alleges that Agway's later variable rates are not based on market-related factors but are instead inflated, price-gouged rates that do not conform with Agway's own "price structure" provisions of its Customer Contract. (*Id.* at ¶¶ 4, 36).

## III. PROCEDURAL HISTORY

Plaintiff initiated this action by filing his Complaint on March 13, 2018. (Docket No. 1). Defendant responded by filing its Motion to Dismiss and Brief in Support on April 30, 2018. (Docket Nos. 21, 22). Plaintiff countered with his Response and Brief in Opposition on May 25, 2018. (Docket Nos. 32, 33, 34). Defendant submitted its Reply on June 8, 2018. (Docket No. 35).

Thereafter, the Court was advised that the parties disputed whether discovery should commence or not while the motion to dismiss remained pending and the Court set a briefing schedule to resolve this matter. (Docket No. 36). Pursuant to the Court's Order, Defendant filed its Motion to Stay on July 17, 2018; Plaintiff submitted his Response on July 27, 2018; and Defendant sought leave to file a reply brief on July 31, 2018. (Docket Nos. 37-40). After considering the parties' arguments, the Court entered an Order on July 31, 2018 staying discovery pending disposition of this motion. (Docket No. 41). Plaintiff then filed a Notice of Supplemental

Authority on September 6, 2018, providing the Court with a decision by the Hon. Mark R. Hornak in another case involving the same subject matter as the instant dispute. (Docket No. 42). Defendant filed a response to Plaintiff's Notice on September 13, 2018. (Docket No. 43). The parties have not requested oral argument and the Court does not believe it is necessary to resolve this straightforward dispute. As the matter is fully briefed, it is now ripe for disposition.

IV.  LEGAL STANDARD

When reviewing a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), the Court must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Eid v. Thompson*, 740 F.3d 118, 122 (3d Cir. 2014) (quoting *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008)). To survive a Rule 12(b)(6) challenge, a plaintiff's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Id.* (quoting *Bell Atl. v. Twombly*, 550 U.S. 544, 555 (2007)). "Thus, 'only a complaint that states a plausible claim for relief survives a motion to dismiss.'" *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)).

Although the Court must accept the allegations in the complaint as true, it is "not compelled to accept unsupported conclusions and unwarranted inferences, or a legal conclusion couched as a factual allegation." *Morrow v. Balaski*, 719 F.3d 160, 165 (3d Cir. 2013) (quoting *Baraka v. McGreevey*, 481 F.3d 187, 195 (3d Cir. 2007)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555). Instead, the plaintiff must plead facts which permit the court to make a reasonable inference that the defendant is liable. *Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 556–57.

Consistent with these principles, the Third Circuit Court of Appeals has prescribed a three-step analysis for purposes of determining whether a claim is plausible. First, the court should "outline the elements a plaintiff must plead to a state a claim for relief." *Bistrian v. Levi*, 696 F.3d 352, 365 (3d Cir. 2012). Second, the court should "peel away" legal conclusions that are not entitled to the assumption of truth. *Id.*; *see also Iqbal*, 556 U.S. at 679 ("While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations."). Third, the court should assume the veracity of all well-pled factual allegations and then "determine whether they plausibly give rise to an entitlement to relief." *Bistrian*, 696 F.3d at 365 (quoting *Iqbal*, 556 U.S. at 679). This third step of the analysis is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* (quoting *Iqbal*, 556 U.S. at 679).

## V. DISCUSSION

Agway argues that the breach of contract claim—the sole remaining claim in the case—should be dismissed because Plaintiff fails to allege any cognizable breach of Agway's duties under the Customer Contract. (Docket No. 22, at 18). In the alternative, Agway claims that dismissal is appropriate because Plaintiff fails to allege compliance with the UCC's notice requirements. (*Id.* at 22). Finally, Agway contends that even if Plaintiff states a plausible claim for breach of contract and satisfied the UCC's notice requirements, the claim is nonetheless barred by the voluntary payment doctrine. (*Id.* at 23).

### A. *Failure to Allege Breach of Contract*

Agway argues that Plaintiff's allegation that he paid too much for his electricity is insufficient to allege a breach of the Customer Contract because it clearly states that Agway has sole discretion to set electricity rates based on numerous factors, which include factors beyond the

"market rate."  (Docket No. 22, at 18).  Agway further claims that its variable rates cannot be compared to the local utility's rates because Agway offers "energy-related, value added services" that the local utility does not.  (*Id.* at 12).  Agway also points to *Orange*, 711 F. App'x 681, as controlling authority on the issue of higher utility rates by EGSs and breach of contract claims by consumers.  (Docket No. 22, at 19).  Plaintiff responds that he adequately pleads a breach of the Customer Contract because the Complaint plausibly shows that Agway failed to charge rates for electricity that were based on market-related factors, which is what the Customer Contract represents.  (Docket No. 33, at 12).  To support his argument, Plaintiff points to the local utility's rates as an accurate reflection of market-based rates and points out that Agway failed to list EnergyGuard (the "energy-related, value added service") in the Customer Contract's price structure section as one of the factors it considers in setting its rates.  (*Id.* at 14–15).  Plaintiff seeks to distinguish *Orange* and directs the Court to a plethora of district court cases, including *Basile v. Stream Energy Pennsylvania, LLC*, No. 15-cv-01518, 2016 WL 4611443 (M.D. Pa. Sept. 6, 2016). (Docket No. 33, at 13).  In reply, Agway insists that its set rates do not constitute a breach but rather conform to its stated price structure, which takes into account factors beyond "market-related" factors. (Docket No. 35, at 6).

     As an initial matter, the Court notes that the parties do not dispute that Pennsylvania law applies to Plaintiff's breach of contract claim and that no choice-of-law analysis is necessary regarding same.  (Docket No. 1, at ¶ 6; Docket No. 22, at 18 n.19).

     Second, while the Court will consider the version of the Customer Agreement provided by the Plaintiff for the reasons stated in footnote 3 above, the Court will also consider the letter from Agway to Plaintiff, dated March 10, 2016 ("Cover Letter"), attached to Agway's Brief in Support. (Docket No. 22-1, at 4).  In doing so, the Court will not convert Agway's motion to a motion for

summary judgment. It is well-settled that in deciding a motion to dismiss, courts generally consider only the allegations contained in the complaint, any exhibits attached to the complaint, and matters of public record. *Oshiver v. Levin, Fishbein, Sedran & Berman*, 38 F.3d 1380, 1384 n.2 (3d Cir. 1994)*, abrogated on other grounds by* *Rotkiske v. Klemm*, 890 F.3d 422, 428 (3d Cir. 2018); *Pension Benefit Guar. Corp. v. White*, 998 F.2d 1192, 1196 (3d Cir. 1993). "However, a plaintiff's failure to attach or cite documents explicitly relied on or integral to the complaint does not preclude the court, when considering a motion to dismiss, from reviewing the text of these extrinsic documents." *Rogan v. Giant Eagle, Inc.*, 113 F. Supp. 2d 777, 780–81 (W.D. Pa. 2000). Indeed, "[c]ourts may consider a document that a defendant attaches as an exhibit to a motion to dismiss, provided that its authenticity is undisputed and that plaintiff's claims are based on the document." *Id.* at 781.[5] Here, it is clear that Plaintiffs' claims are based upon the "Customer Contract," and § 1 of the Customer Contract states that "[t]he Agreement includes the Cover Letter and any approved addenda." (Docket No. 1-1, at 3). Plaintiff clearly does not dispute the authenticity of the Cover Letter because he relies on it in his Brief in Opposition for factual support of Agway's price structure promises. (Docket No. 44, at 7, 12). Thus, the Court will consider the Cover Letter as part of the "Customer Contract" without converting Agway's Motion to Dismiss to a motion for summary judgment.

The Cover Letter, in relevant part, states:

By choosing Agway as your supplier, West Penn Power will continue to provide safe, reliable energy delivery services and will respond in emergencies, regardless of your energy supplier.

We're excited to be providing you with our competitive monthly variable price starting with your next scheduled meter reading.

---

[5] This exception to the general rule wherein courts convert a motion to dismiss to one for summary judgment when considering extrinsic evidence "is premised on the theory that when a complaint relies on a document, the plaintiff is clearly on notice as to its contents and the need for an opportunity to refute the evidence is diminished." *Rogan*, 113 F. Supp. 2d at 781.

**For being an Agway electricity customer, we also include the peace of mind and added value of Agway Energy Services EnergyGuard Repair Program. Agway EnergyGuard provides you with protection in the event of a breakdown of your residential central air conditioning unit or a problem with the electrical wiring in your home. It provides up to a maximum of $1000 for parts and labor per each service plan every calendar year that you're a customer.**

(Docket No. 22-1, at 4 (emphasis in original)).

Under Pennsylvania law, a claim for breach of contract has three elements: "(1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract and (3) resultant damages." *Kaymark v. Bank of Am.*, 783 F.3d 168, 182 (3d Cir. 2015) (quoting *Omicron Sys., Inc. v. Weiner*, 860 A.2d 554, 564 (Pa. Super. Ct. 2004)).[6] "When a written contract is clear and unequivocal its meaning must be determined by its contents alone." *Robert F. Felte, Inc. v. White*, 302 A.2d 347, 351 (Pa. 1973) (internal quotations omitted).

The parties do not dispute that the Customer Contract (which incorporates the Cover Letter) constitutes a valid contract. (Docket No. 1, at ¶ 65; Docket No. 22, at 18). The dispute lies in whether Plaintiff has sufficiently alleged a breach of that contract with respect to the price structure terms. Plaintiff relies solely on the Customer Contract's language that the variable rate structure revolves around "market-related factors," and thus, Plaintiff concludes, the ultimate rate must be competitive with the local utility's rates. (Docket No. 33, at 12). Because Agway charged variable rates between 20% and 46% higher than the local utility's rate, Plaintiff alleges that Agway is in breach of the Customer Contract's variable rate terms. Plaintiff, however, argues an implausible

---

[6]     The essential elements of a contract will be found to exist where: (1) "both parties have manifested an intent to be bound by the terms of the agreement," (2) "the terms are sufficiently definite," and (3) "consideration existed." *Johnston the Florist, Inc. v. TEDCO Constr. Corp.*, 657 A.2d 511, 516 (Pa. Super. Ct. 1995). The agreement shall be considered valid and binding if all three elements exist. *Id.*

interpretation of the plain language of the agreement and fails to acknowledge multiple contractual provisions that defeat his argument and his claim.

The price structure summary, (Docket No. 1-1, at 2), and the price structure clause in the Customer Contract, (*id.* at 3), clearly state that the electric variable rate is set each month "at Agway's discretion" and "reflect[s]" multiple enumerated factors. Other courts in this circuit that have reviewed EGS variable rate contracts acknowledge that an EGS does not have "*carte blanche*" discretion to set rates when it also promises to base its rates on enumerated factors. *Landau v. Viridian Energy PA LLC*, 223 F. Supp. 3d 401, 409 (E.D. Pa. 2016); *see also Basile*, 2016 WL 4611443. In *Basile*, the variable rate was structured to "fluctuate 'at the sole discretion of [defendant], based upon the fluctuation of wholesale natural gas prices or other inputs to wholesale electric prices.'" 2016 WL 4611443, at *4 (quoting the operative complaint). The *Basile* Court concluded that the defendant had a duty to set a rate with a basis in "natural gas prices or other inputs," so the plaintiff's allegation that no such basis existed (because rates were set "well above market rates") sufficiently pled a breach of contract claim. *Id.*

The Court agrees that the terms of the Customer Agreement here do not give Agway total discretion to set whatever electricity rate it so chooses, but the inclusion of the term "discretion" does provide Agway with some leeway in setting its rate. *Orange v. Starion Energy PA, Inc.*, No. 15-773, 2016 U.S. Dist. LEXIS 33656, at *8 (E.D. Pa. Mar. 16, 2016) ("[W]here discretion is given under a contract, the discretion must be exercised reasonably.") (citing *Haywood v. Univ. of Pittsburgh*, 976 F. Supp. 2d 606, 628 (W.D. Pa. 2013)). Thus, the Court must look at exactly what Agway promised with respect to its rate structure and determine whether a rate that is 20% to 46% higher than the local utility's rate could plausibly indicate that Agway breached the price terms.

The Customer Contract provides the price terms of its variable rates in two locations. On the first page, in the easy-to-read chart, Agway states that it will set a rate:

> [A]t Agway's discretion and reflect the cost of electricity acquired by Agway from all sources (including energy, capacity, settlement, ancillaries), related transmission and distribution charges, renewable energy compliance charges and other market-related factors, plus all applicable taxes, fees, charges or other assessments and Agway's costs, expenses and margins. The underlying costs are a derivative of the PJM market.

(Docket No. 1-1, at 2). The next page of the Customer Agreement provides a more in depth description:

> 1. The variable price will be calculated by Agway, at Agway's discretion, on a customer specific basis each billing cycle and will include all of the costs incurred in providing service to customer, including the following: electricity acquired by Agway from all sources (including energy, capacity, settlement, ancillaries), transmission and distribution charges, renewable energy compliance charges, other market-related charges, plus all applicable taxes including the gross receipts tax, fees, charges or other assessments and Agway's costs, expenses and margins. The underlying costs are a derivative of the PJM market (PJM Interconnection, LLC is a regional transmission organization that coordinates the movement of wholesale electricity in all or parts of 13 states, including Pennsylvania). This price will be calculated for each meter each month, depending upon factors such as changes in wholesale energy prices, or other variables listed above, and so the price for each meter, even for the same customer, are likely to be different each month. All charges will be included in our monthly, per kwh charge. There is no limit on how much the variable rate can change from one billing cycle to the next. Historical prices are not indicative of present or future prices. To obtain historical average billed prices, please contact us at 1-888-982-4929 or www.agwayenergy.com.
>    a. Generation prices are set by the electric generation supplier you have chosen, in this case, Agway. The Pennsylvania Public Utility Commission regulates distribution prices and services. The Federal Energy Regulatory Commission regulates transmission prices and services.

(Docket No. 1-1, at 3).

Agway clearly did not promise money savings, since the Customer Contract also explicitly states that there is no "guarantee of future savings." (*Id.* ("Statement Regarding Savings: Participation in this program is NOT a guarantee of future savings.")). *Cf. Landau,* 223 F. Supp.

3d at 409–10 (denying the motion to dismiss breach of contract claim because the agreement between the consumer and the EGS included promises of "saving money" and rates that were double the local utility's plausibly alleged a breach of such promise). Plaintiff in this case argues that Agway's charged variable rates breached the pricing terms of the Customer Contract because the local utility rates incorporate essentially the same factors as Agway's, so the difference between the two rates each month shows plausible price gouging, which is a breach of Agway's pricing terms. (Docket No. 1, at ¶¶ 38, 42). The Court concludes this "comparison" provides insufficient factual support for Plaintiff's claim to survive Agway's Motion to Dismiss.

The Third Circuit Court of Appeals has held that with respect to breach of contract claims, "[t]hat the price *far* exceeded the local public utility rate for a discrete amount of time is not sufficient to show that [the EGS] breached its duty to calculate the price in accordance with the contract." *Orange*, 711 F. App'x at 683 (emphasis added).[7] That is because "[t]he contract does not require [the EGS] to charge rates tied only to rates otherwise available or to wholesale rates or to charge rates lower than those charged by [the public utility]." *Sevugan v. Direct Energy Servs., LLC*, No. 1:17-CV-6569, 2018 WL 2267806, at *8 (N.D. Ill. May 17, 2018) (concluding no breach of contract where defendant's rates were up to 350% higher than the local utility rates and the price structure was based on "generally prevailing market prices for electricity . . . plus an adder, determined solely by [defendant] in its discretion."). *See also Gillis v. Respond Power, LLC*, No. 14-CV-3856, 2018 WL 3427636, at *5 (E.D. Pa. July 16, 2018), on appeal, No. 18-2765 (3d Cir.) ("The fact that this list of factors does not include the rate charged by the local utility company

---

[7]     Although Plaintiff correctly points out that *Orange* is a non-precedential opinion, "[a]n 'unreported-not precedential' opinion is not binding authority, but may be cited as persuasive authority." *Prudential Prop. & Cas. Ins. Co. v. Jefferson*, 185 F. Supp. 2d 495, 499 n.1 (W.D. Pa. 2002). The Court finds the recent opinion by the Third Circuit Court of Appeals in *Orange* highly persuasive given the similar set of facts.

further belies [p]laintiffs' reading of the Variable Rate Provision as a promise to charge no more than that rate."); *Hamlen v. Gateway Energy Servs. Corp.*, 16-CV-3526, 2017 WL 892399, at *4 (S.D.N.Y. Mar. 6, 2017) (dismissing breach of contract claim where rates were more than 200% local utility rates because "defendant['s] discretion to set rates based on many other factors" does not result in a breach when defendant charges a rate that does not "track wholesale or competitors' rates").[8]

As the *Hamlen* Court pointed out, Plaintiff's allegation in his Complaint that "purchases made by the utilities from the wholesale market reflect actual market costs and conditions" confuses wholesale rates with Agway's actual costs. (Docket No. 1, at ¶ 41); 2017 WL 892399, at *4. Plaintiff's Complaint acknowledges that the very purpose of deregulating the energy market was to allow EGSs, like Agway, to use "innovative purchasing strategies" to buy electricity. (Docket No. 1, at ¶ 20). While lawmakers may have intended for this to result in lower prices for consumers, the "various options" for purchasing electricity gives Agway discretion as to how it acquires its electricity. (*Id.*) Agway could have bought electricity wholesale, "either in advance or on the spot market, produce its own supply, or contract from other brokers. Moreover, retailers often seek to offset market volatility through futures contracts, which could also impact [Agway's] costs." Because Plaintiff does not plead how Agway filled its supply needs, it cannot equate wholesale rates with Agway's acquisition costs, and a difference of even 46% in a discrete window of time is not sufficiently unreasonable to give rise to a plausible breach of Agway's price structure

---

[8]     After the *Hamlen* Court dismissed the breach of contract claim and the parties engaged in discovery on the remaining claims, the plaintiff sought leave to amend his pleading in order to re-plead breach of contract with new facts (testimony from the defendant's corporate representative) showing that the defendant intentionally concealed customer attrition and retention as a "primary" factor in setting its variable rate. *Hamlen v. Gateway Energy Servs. Corp.*, No. 16-CV-3526, 2017 WL 6398729, at *4 (S.D.N.Y. Dec. 8, 2017). The *Hamlen* Court granted the motion, holding that the amended complaint plausibly alleged a breach of contract on the basis that "the Listed Factors did not describe the major components that influence[d] [Gateway's] analysis in a typical month." *Id.* at *6 (internal quotations omitted). The factual allegations brought by Plaintiff in this case more closely resemble the factual allegations supporting the first complaint in *Hamlen* and likewise require dismissal.

even if Agway's price structure was more narrowly tailored to simply "market factors." *See Hamlen*, 2017 WL 892399, at \*4. But the price structure here is not so narrowly tailored.

So long as the contractual price structure incorporates some factor beyond market factors, "a simple comparison of [the EGS's] rate to the local public utility rate is not sufficient to support the reasonable inference that [the EGS] did not adhere to that formula." *Orange*, 711 F. App'x at 684.[9] Here, Agway's price structure was based on many factors beyond "market-related charges." (Docket No. 1-1, at 2–3). Agway gave itself discretion in setting rates. (*Id.*) Many cases on which Plaintiff relies to support his argument that high EGS rates demonstrate unlawful price gouging involved written agreements where discretion was not a named factor and the price was explicitly linked to only market conditions, thus distinguishing those holdings from this case. *See Melville v. Spark Energy, Inc.*, No. 15-CV-8706, 2016 WL 6775635, at \*1, \*3 (D.N.J. Nov. 15, 2016) (denying motion to dismiss breach of contract where EGS "specifically linked prices to market conditions" yet charged up to 400% more than the local utility); *Claridge v. N. Am. Power & Gas, LLC*, No. 15-CV-1261, 2015 WL 5155934, at \*4 (S.D.N.Y. Sept. 2, 2015) (denying motion to dismiss breach of contract where EGS's variable rate price structure—resulting in almost 300% higher rates—did not include a discretionary factor but was "incomplete and confusing" and "could lead a reasonable consumer to believe" that they would receive a competitive rate); *Yang Chen v. Hiko Energy, LLC*, No. 14-CV-1771, 2014 WL 7389011, at \*5 (S.D.N.Y. Dec. 29, 2014) (denying motion to dismiss breach of contract where EGS promised savings during teaser rate window yet plaintiffs did not save money during the teaser rate window and EGS's variable rate

---

[9]     Plaintiff seeks to distinguish *Orange* on the basis that the defendant's price structure took into account market conditions of multiple geographic areas, so its rates could not be compared to the local utility's rates in one area. (Docket No. 33, at 16). Such a factual difference (*what* the different factors are between the EGS and the local utility) does not take away from the *Orange* holding that when two sets of rates are computed with different factors, they cannot be fairly compared to one another.  711 F. App'x at 684.

price structure—which led to rates that were 300% higher than the local utility—did not include a discretionary factor).

Furthermore, the percent difference of 20% to 46% is a lower rate discrepancy than most of the cases relied upon by Plaintiff where the price structure incorporated a discretionary factor. *See Sobiech v. U.S. Gas & Electric, Inc.*, No. 14-CV-4464, Docket No. 17, at ¶ 28 (E.D. Pa. Feb.4, 2015) (EGS charged rates 300% higher than the local energy provider); *Landau*, 223 F. Supp. 3d at 409 (EGS charged rates that were 100% greater than the local utility).[10]  In cases where the EGS's rates were multiples higher, the rate structure would naturally be more suspect, which is why many of those cases also included a claim for breach of the covenant of good faith and fair dealing.[11]  *See, e.g.*, *Landau*, 223 F. Supp. 3d 401.

Therefore, Plaintiff's factual allegation regarding the discrepancy between the local utility rate and Agway's utility rate as pled in the Complaint, in light of Agway's discretion to set rates, is insufficient to "support the reasonable inference that [Agway] did not adhere to [its rate] formula." *Orange*, 711 F. App'x at 684.[12]

---

[10]    *But see Oladapo v. Smart One Energy, LLC*, No. 14-CV-7117, 2016 WL 344976, at *2 (S.D.N.Y. Jan. 27, 2016) (denying motion to dismiss breach of contract claim where EGS's rate was 35% higher than the local utility rate but EGS promised savings on one's utility bill and rates that would "remain competitive in the industry"). Although the *Oladapo* Court recognized that the EGS had some discretion to set its rates, it distinguished its holding from cases where the agreement's price structure included "non-market-based factors" and agreements that had "a statement that the private utility's prices 'may be higher or lower' than the public utility." *Id.*  Both of those facts also distinguish *Oladapo* from this case.

[11]    Here, Plaintiff characterizes rates that are 20% to 46% higher than the local utility to constitute "profiteering . . . so extreme that its rate bears no relation to market prices but is instead outrageously higher." (Docket No. 1 ¶ 46). Plaintiff does not plead what other EGSs in the area charged during these months, leaving these statements to be unsupported conclusions.

[12]    Plaintiff also relies upon an unpublished court order in *Sobiech v. U.S. Gas & Electric, Inc.*, No. 14-CV-4464, Docket No. 24 (E.D. Pa. Feb.4, 2015), denying a motion to dismiss a breach of contract claim. Plaintiff attached a copy of that order to its Brief in Opposition. (Docket No. 34-1, at 1).  That court did deny the defendant's motion to dismiss a breach of contract claim, but the court's order contains no legal support for its ruling for this Court to consider.  The Court has reviewed the amended complaint at issue in *Sobiech* (which Plaintiff did not include in his appendix) and concludes the factual allegations therein are in no way "virtually identical to the rate specifications in Agway's contract."  (Docket No. 33, at 9; *Sobiech*, No. 14-CV-4464, Docket No. 17).  The *Sobiech* amended complaint alleged that the EGS made affirmative promises to the consumer to help the consumer lower her total energy

The discretion factor and varying market factors aside, Plaintiff's attempt to rely on a comparison between Agway's variable rates and those of the local utility still fails because Agway's price structure incorporates "all of the costs incurred in providing service to customer, including . . . Agway's costs, expenses and margins." (Docket No. 1-1, at 3). Agway may, for example, factor in the cost of its incentive program, EnergyGuard. By including the "costs, expenses and margins" factors into its rate structure, Agway has promised a rate structure that allows it to pass on *its* costs and expenses to consumers. That Agway did not specifically cite to EnergyGuard or an "incentive program" in the specific rate sections of the Customer Contract is of no consequence. The plain meaning of "the costs incurred in providing *service* to customer, including . . . Agway's costs, expenses and margins" would include Agway's services beyond the mere delivery of electricity. (Docket No. 1-1, at 3 (emphasis added)).[13] The incentive program is not an added cost that Agway hid from Plaintiff. The EnergyGuard program is mentioned on every

---

costs, an allegation that is not present in this complaint. *Id.* at ¶ 16. The *Sobiech* amended complaint also focuses on the EGS's advertisements and content outside the actual customer contract, components that are not found in Plaintiff's Complaint. *Id.* Finally, the agreement attached to the *Sobiech* amended complaint makes no reference of a program or incentive comparable to Agway's EnergyGuard. The differences in allegations between the *Sobiech* amended complaint and Plaintiff's Complaint in this case and the absence of persuasive legal authority explaining the *Sobiech* court's decision to deny the motion to dismiss give the *Sobiech* ruling little value to the issues present here.

[13] The Court rejects Plaintiff's argument that the language of the Customer Contract is ambiguous because the Customer Contract fails to explain "the extent to which Agway's rates must be based on market-related factors." (Docket No. 33, at 9). Plaintiff's position is untenable because Agway clearly lays out an exhaustive list of factors of which its rates "reflect." (Docket No. 1-1, at 2). "[T]here is no ambiguity if one of the two proffered meanings is unreasonable." *Trizechahn Gateway LLC v. Titus*, 976 A.2d 474, 483 (Pa. 2009). Plaintiff's attempts to show what Agway's "Contract Rate" should have been is also unsupported by any factual allegations. In the Court's estimation, the two pled charts, taken together, undermine Plaintiff's argument that the local utility's rates offer an appropriate benchmark of what the market rate should have been. For the May 17, 2016, billing period, Plaintiff alleges that Agway charged 20% more than West Penn Power charged, yet Agway's rate was somehow 40% higher than what Plaintiff claims "Agway should have charged for electricity based on the factors enumerated in its contract." (Docket No. 1, at ¶¶ 39, 48). This implies that Agway was contractually bound to charge rates 20% less than the local utility for that billing period, a result that completely undercuts Plaintiff's argument that Agway's rate must reflect market-related factors and the local utility's rate is an accurate reflection of market-related factors. (Docket No. 1-1, at ¶¶ 36, 37).

page of the Customer Contract and is also mentioned in the Cover Letter. (Docket No. 1-1; Docket No. 22-1, at 4).

Plaintiff argues that of all the price structure factors enumerated, the "factors beyond the wholesale electricity cost are 'insignificant in terms of the overall costs,'" but Plaintiff's statement that factors beyond electricity acquisition costs represent only an "insignificant" adder (and thus cannot account for up to a 46% differential) is a conclusory statement unsupported by factual allegations. (Docket No. 33, at 17 (quoting Docket No. 1, at ¶ 45)). Plaintiff directs the Court to Paragraphs 40 through 50 of his Complaint as "explaining how each of those factors affect the rate," yet these allegations do not shed any light on "how the components exclusive to EGSs such as Agway might cause variations in Agway's rates." (Docket No. 33, at 17). As Plaintiff has failed to allege that his rate comparator, the local utility, incorporates costs, expenses, and margins comparable to those of Agway, he has failed to allege sufficient facts to state a plausible claim for breach of contract. *Orange*, 711 F. App'x at 684.

Along these same lines, Plaintiff's attempt to align this case with the Court's recent decision in *Gorecki v. Clearview Elec., Inc.*, No. 2:18-cv-00035, 2018 U.S. Dist. LEXIS 151194 (W.D. Pa. Sep. 5, 2018), is unsuccessful.[14] *Gorecki* addressed an EGS's variable rate that was promised to be "based on wholesale market conditions." *Id.* at *4. The Court explicitly noted that the contractual rate did not "list factors besides 'wholesale market conditions.'" *Id.* In addition, the "variable" rate charged by the EGS actually did not vary but remained constant for eleven consecutive months. *Id.* at *5 ("Between September 11, 2016, and August 13, 2017, Clearview's rate was .1299/kwh each and every month."). In light of the fact that the "wholesale market price" fluctuated substantially during that time frame and the fact that the contract did not list additional

---

[14]    Plaintiff filed Notice of Supplemental Authority, Docket No. 42, referencing the *Gorecki* opinion.

factors beyond "wholesale market condition," the *Gorecki* Court concluded that Plaintiff stated a facially plausible claim for breach of contract. *Id.* at *15. Those facts wholly distinguish *Gorecki* from the facts before the Court in this case.

Finally, Plaintiff's reliance on a phrase in the Cover Letter, "[w]e're excited to be providing you with our *competitive* monthly variable price," is insufficient to create a promise to keep rates comparable *to the local utility*. (Docket No. 33, at 6). As explained above, Plaintiff fails to provide any factual allegations that Agway's rates were not "competitive" in the marketplace.[15] *Cf. Landau*, 223 F. Supp. 3d at 406 (denying motion to dismiss breach of contract where cover letter promised that the consumer would be "saving money on your energy costs").

Plaintiff's breach of contract claim is dismissed as it fails to "raise a right to relief above the speculative level." *Eid*, 740 F.3d at 122. Despite a request from Plaintiff for leave to amend (Docket No. 33, at 11 n.3), the Court is at a loss for what additional facts Plaintiff could plead that would overcome the deficiencies in his Complaint; therefore, leave to amend is futile. *Johnson v. Wylie*, 733 F. App'x 31, 32 (3d Cir. Aug. 2, 2018) (per curiam) (citing *Grayson v. Mayview State Hosp.*, 293 F.3d 103, 108 (3d Cir. 2002)). Plaintiff had an opportunity to amend under Rule 15(a)(1)(B)(i) upon receipt of Agway's Rule 12 motion but declined to do so. Furthermore, Plaintiff's bare request for leave to amend (that is tucked in a footnote of his brief in response) does not allege what additional facts it could include that would cure the deficiencies alleged by Agway and identified by the Court herein. *United States ex rel. Wilkins v. United Health Grp.,*

---

[15] Plaintiff argues that the use of the work "competitive" means "commensurate with the rates of its competitors like other EGSs and the local utilities . . . ." (Docket No. 33, at 8; Docket No. 1, at ¶ 46 ("That other EGSs' rates are lower . . . demonstrates that Agway sets its prices in bad faith.")). Plaintiff pled no information about the rates of other EGSs nor did Plaintiff provide any details about these "competitors" in his responses to the Motion to Dismiss. *Sevugan v. Direct Energy Servs., LLC*, No. 17 C 6569, 2018 WL 4126568, at *6 (N.D. Ill. Aug. 29, 2018) ("'Generally prevailing market prices' necessarily includes prices charged by more than one market participant."). This is not a difficult task, as the Customer Contract even directs Plaintiff to a website, www.PaPowerSwitch.com, where Plaintiff can compare rates from all EGSs that could provide service to him. (Docket No. 1-1, at 3 ¶ 19).

*Inc.*, 659 F.3d 295, 314–15 (3d Cir. 2011), abrogated on other grounds by *United States ex rel. Freedom Unlimited, Inc. v. City of Pittsburgh*, 728 F. App'x 101, 106 (3d Cir. 2018), ("[A]ppellants' failure to explain how they could have amended the complaint to cure its deficiencies is a critical omission," and a request in a responsive brief for leave to amend, "without an attached amended complaint, [is] not the proper method for appellants to seek to amend their complaint.").

B. *UCC Notice Requirements and Voluntary Pay Doctrine*

Because the Court concludes that Plaintiff fails to state a claim for his sole remaining count in this case, breach of contract, the Court need not address whether the Count satisfies the UCC Notice Requirements or whether the Voluntary Payment Doctrine bars Plaintiff's claim.

VI.    CONCLUSION

For the foregoing reasons, Defendant Agway's Motion to Dismiss, (Docket No. 21), is GRANTED. This case is dismissed with prejudice.

An appropriate Order follows.

*/s Nora Barry Fischer*
Nora Barry Fischer
United States District Judge

Dated: September 13, 2018

cc/ecf: All counsel of record.